UNITED STATES, Appellee

V.

John C. McALLISTER, Specialist
U.S. Army, Appellant

No. 00-0252

Crim. App. No. 9601134

_____

United States Court of Appeals for the Armed Forces

Argued January 10, 2001

Decided August 2, 2001

GIERKE, J., delivered the opinion of the Court, in which
EFFRON and BAKER, JJ., joined. CRAWFORD, C.J., and
SULLIVAN, J., each filed a dissenting opinion.

Counsel

For Appellant: Richard T. McNeil (argued); Colonel Adele H.
Odegard, Lieutenant Colonel David A. Mayfield, and Major
Jonathan F. Potter (on brief); Captain David S. Hurt.

For Appellee: Captain Arthur L. Rabin (argued); Colonel David L.
Hayden, Lieutenant Colonel Edith M. Rob, and Major Anthony P.
Nicastro (on brief); Major Patricia A. Ham.

Military Judges: Patrick K. Hargus and Debra L. Boudreau (trial)

**This opinion is subject to editorial correction before publication.**

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of unpremeditated murder and disobeying the order of a superior commissioned officer, in violation of Articles 118 and 90, Uniform Code of Military Justice, 10 USC §§ 918 and 890, respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence.

This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION IN REFUSING TO ALLOW THE DEFENSE TO UTILIZE EXPERT ASSISTANCE AT APPELLANT'S COURT-MARTIAL.

In addition, this Court specified the following issues:

I

WHETHER THE COURT OF CRIMINAL APPEALS MADE FACTUAL FINDINGS THAT ARE UNSUPPORTED BY THE RECORD.

II

WHETHER THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE FINDINGS OF GUILTY.

III

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN SHE REFUSED TO ALLOW A RETEST OF MATERIALS FOUND UNDER THE VICTIM'S FINGERNAILS WHEN FUNDS HAD BEEN PREVIOUSLY MADE AVAILABLE FOR DEFENSE INVESTIGATIVE ASSISTANCE AND AN EXPERT TESTIFIED THAT SUCH TESTING WAS APPROPRIATE. SEE UNITED STATES V. GARRIES, 22 MJ 288 (CMA 1986).

For the reasons set out below, we set aside the decision below and remand for further proceedings.

2

## Factual Background

This case arose from the prosecution of appellant for the murder of Private First Class (PFC) Carla Shanklin, who was found dead in her government quarters at Helemano Military Reservation, Hawaii. The cause of death was determined to be "manual strangulation, either alone or in combination with one of the other forms of asphyxia," such as use of a ligature like the necklace PFC Shanklin was wearing or "burking" -- a combination of smothering and pressure on the chest.

Appellant lived with PFC Shanklin, her 3-year-old daughter, and her 15-year-old sister, Kijafa Walker, until June 23, 1995. (R. 826, 828-30, 965) On that date, appellant and PFC Shanklin had a physical altercation in her quarters. PFC Shanklin called the Military Police, who apprehended appellant and removed him from the quarters. The next day, June 24, appellant's commander ordered him to stay away from PFC Shanklin's quarters. Appellant's conviction of willful disobedience of this no-contact order is not at issue in this appeal.

On the afternoon of July 7, 1995, the day before her death, appellant went to PFC Shanklin's quarters and asked Kijafa when she would return. Kijafa told appellant that she would return at about 1:00 p.m., and appellant waited "outside walking up and down, up and down." PFC Shanklin actually returned between 2:30 and 3:00 p.m., accompanied by Sergeant (SGT) Harris, her squad leader, who was teaching her how to drive a car with a manual transmission. They continued to drive around for about 30 minutes.

PFC Shanklin and appellant then conversed sometime between 4:00 p.m. until about 6:00 p.m., when appellant left PFC Shanklin's quarters and went to the quarters of Staff Sergeant (SSG) Kimberly Rogers, with whom he was then living. Appellant and SSG Rogers had an argument that evening, which ended when Rogers told him that she "didn't want him anymore" because she thought he was involved with another woman named Carla [PFC Shanklin's first name]. According to SSG Rogers, he responded as if he "didn't care."

Appellant then went to the Noncommissioned Officers' (NCO) Club at Schofield Barracks, where he became involved in a conversation with SSG Michael Jones about Jones' relationship with PFC Shanklin. Although SSG Jones insisted that he was just "friends" with PFC Shanklin, appellant ended the conversation by saying, "I love her, she loves me, and may the best man win." SSG Jones noticed appellant's white four-door Cadillac parked in the NCO Club parking lot. He last saw appellant between 7:45 p.m. and 8:00 p.m.

SSG Jones went to PFC Shanklin's quarters, and from about 9:15 p.m. until 12:45 a.m., they drove around in Jones' truck. They had intended to return earlier but were delayed because they had a flat tire. Appellant called PFC Shanklin at about 9:30 p.m., but her sister told him that she was not home.

Kijafa testified that she was awakened during the night by a female scream that sounded frightened and "like it didn't get a chance to finish." She looked into the hallway, saw nothing, and then went back to bed.

4

Between 4:00 and 4:30 a.m., SGT Christopher Robinson, who shared a common bedroom wall with PFC Shanklin, also heard a loud, shrill scream that "was cut off." He then heard "a rhythmic thumping" for about 15-30 seconds. At about 5:00 a.m. he heard a car door slam.

At about the same time, Ms. Marion McCloud, who lived across the street, was awakened by a loud noise. She looked out the window and saw a white car parked in the parking lot, "which was unusual because usually no white cars parked there at night."

The next morning, Kijafa attempted to awaken PFC Shanklin by calling her name. She noticed that PFC Shanklin was not moving, had foam coming from her mouth, and had bruises on her arm. She went outside and told SGT Robinson, who was working on his car, that she could not awaken PFC Shanklin. Kijafa asked SGT Robinson to ask his wife to come outside, and she then asked Mrs. Robinson to help her awaken PFC Shanklin. SGT Robinson and his wife went to PFC Shanklin's bedroom, where he saw foam and blood coming from her mouth and noticed that she was was cold and stiff. He also noticed that the bedroom window was open with the blinds down and a dresser seemed out of place. According to Kijafa, PFC Shanklin never opened the window.

SGT Robinson talked to the Military Police, and Kijafa paged appellant several times. When appellant called back, Kijafa told him that "something happened and you need to get over here." After appellant repeatedly asked why, SGT Robinson took the telephone and said, "Something happened to Carla." Appellant responded "almost jokingly," "Why, is she dead?" SGT Robinson said, "Yes," and appellant "started to cry."

Kijafa testified that she did not tell appellant that PFC Shanklin was dead. In cross-examination, however, she admitted that she initially told an agent from the U.S. Army Criminal Investigation Command (CID) that she told appellant that PFC Shanklin "might be dead." She testified that she was "shaken up" and answered without thinking when she talked to the CID, but she insisted at trial that she did not tell appellant that PFC Shanklin was dead.

Another soldier drove appellant to PFC Shanklin's quarters. When the soldier asked appellant why he was crying, appellant said, "Carla's dead." Appellant also told the soldier that "he knew they were going to try to pin it on him because [she] was his girlfriend."

Appellant was questioned by CID Special Agent (SA) West. Appellant told SA West that he spent the night with SSG Rogers, except for about 30 minutes around midnight when he drove his car to a Texaco station, left it there, and walked back. Appellant's alibi was contradicted by SSG Rogers, who testified that appellant left around 11:00 p.m. and did not return until daybreak. Appellant did not testify at trial.

When he interviewed appellant, SA West observed scratches on his arms and a gouge on his index finger. SSG Rogers testified that, on July 9, appellant pointed to the scratches on his arm and said, "Girl, you tore me up," and "Kim, you scratched me, you did scratch me." SSG Rogers denied scratching appellant.

Mr. George Grady testified that around 9:30 a.m. on July 8, 1995, the day after PFC Shanklin's death, appellant came to his house with a container "about the size of a shoe box" and asked

him to get rid of the box for him. As they were talking, appellant seemed nervous and said, "I--I--I did this -- I did something." Mr. Grady threw the box into a dumpster without opening it.

Deoxyribonucleic acid (DNA) tests were performed on a substance found under PFC Shanklin's fingernails, as well as blood samples taken from appellant, the other suspect, and PFC Shanklin's daughter and sister, to determine their respective DNA profiles. The tests did not exclude the possibility that the material under PFC Shanklin's fingernails contained the DNA of more than one person. The tests excluded all donors of DNA samples as possible sources of the material, except for appellant and PFC Shanklin.

The prosecution's expert, Ms. Meghan Clement, explained the testing process. She testified that the DNA from the material under PFC Shanklin's fingernails was tested for eight separate genetic systems. Appellant's DNA and the DNA of the material under PFC Shanklin's fingernails matched each other in all eight genetic systems. Ms. Clement testified that all the other suspects, as well as PFC Shanklin's sister and daughter, were excluded as possible sources because their DNA did not match the material under the fingernails in at least one genetic system.

On cross-examination, Ms. Clement testified that, after the testing of appellant's DNA, her laboratory started testing for two additional genetic systems. Neither Ms. Clement nor any other witness stated how many known genetic systems there were at the time of trial or how many systems could have been reliably identified by the DNA test used in this case <u>see</u> ___ MJ at <u>(9)</u>.

7

The DNA evidence in this case was not tested for the two additional genetic systems.  Ms. Clement opined that the possibility of excluding appellant as a donor of the DNA by testing for the two additional genetic systems was remote, because she had never seen a case where there were six or seven matches followed by a failure to match in the eighth, ninth, or tenth tests.  Defense counsel did not challenge her assertion or question her regarding the number of cases on which her assertion was based.

The DNA evidence was of considerable interest to the members, as evidenced by questions from six of the eight members.  Their questions pertained to the possibility of contamination of the samples, the potential for multiple contributors, the explanation for the limited readings from PFC Shanklin's right fingernail, the possibility of mistakes in the chain of custody, and the possibility of a retest.

Expert Assistance (Granted Issue and Specified Issue III)

Before trial, appellant asked the convening authority for expert assistance.  He specifically asked that Dr. Patrick Conneally, PhD, be appointed under Mil. R. Evid. 502, Manual for Courts-Martial, United States (2000 ed.), as a defense consultant on DNA evidence.  He also asked that Dr. Conneally be produced at government expense as a defense expert witness.  On April 4, 1996, the convening authority approved the request to employ Dr. Conneally.

At a motions hearing on April 23, 1996, defense counsel informed the military judge that Dr. Conneally had advised employing someone else who was an expert in Polymerase Chain

Reaction (PCR) testing. Defense counsel informed the military judge that he was "attempting to contact Doctor Conneally to get his suggestions on someone" to perform the PCR testing. The defense filed a motion to preserve the evidence for further DNA testing and requested the convening authority to provide funds for DNA testing by an independent laboratory. The estimated cost of DNA retesting was $3000-4000. The military judge granted a defense motion to preserve the evidence for possible retesting, but the convening authority denied a defense request for funds to obtain an independent DNA test.

Dr. Conneally recommended that Dr. Edward Blake be retained. Dr. Blake operates a DNA testing laboratory in California and had indicated his willingness to conduct additional DNA testing. Dr. Blake informed the defense that LabCorp, the laboratory used by the Government, had not followed "the standard general criminal forensic testing standards" in conducting its analysis.

At a motions hearing on May 15, 1996, the defense asked the military judge to order that funds be made available to hire Dr. Blake as a defense consultant and to conduct another DNA test. When asked by the military judge what would be accomplished by additional testing, defense counsel explained that they were concerned with possible contamination of the samples and misidentification of the sample taken from appellant. The military judge cautioned defense counsel, "[D]on't make this DNA evidence into something more than it really is."

After considerable discussion about the need for DNA retesting, defense counsel informed the military judge: "The defense position really is that we would like to substitute

Doctor Blake for Doctor Conneally[.]" Defense counsel informed the military judge that $6000 was approved to retain Dr. Conneally, but only $1000 had been spent. Nevertheless, the military judge denied the defense request, explaining her decision as follows:

> It's up to the defense to figure out from the get go who they wanted as an expert. The convening authority, in good faith, relied upon the defense representation, looked at Doctor Conneally's qualifications. And we were litigating the issue of DNA experts earlier on face value as it was presented to the convening authority, Doctor Conneally appears to have impeccable credentials. Now, at the time that you requested the expert that was when the time was to decide who could provide the defense requested assistance. The convening authority gave the defense what they wanted and there's nothing before me to suggest that it's fundamentally unfair to require the defense to go with the expert that they asked for and the convening authority in good faith gave them for the purposes of preparing for trial.

The military judge left the door open for the defense to ask the convening authority to substitute Dr. Blake for Dr. Conneally. The defense asked the convening authority to substitute Dr. Blake for Dr. Conneally, but the convening authority denied the request, prompting the defense to ask for a continuance "for at least one month." In its request, the defense asserted that the funds allocated for Dr. Conneally were sufficient to retain Dr. Blake. Finally, the defense explained its reasons for the change of experts:

> The fact of the matter is that the state of Hawaii does not have any forensically trained DNA labs of testing experts and the defense therefore needed the consultation of Dr. Conneally to be pointed in the right direction to a forensic expert, such as Dr. Blake.

The military judge denied the defense request for a continuance, remarking that "there is still nothing new in this appellate exhibit that would cause me to reconsider my earlier ruling on this matter."

Defense counsel then informed the military judge that he had not requested that Dr. Conneally be summoned to testify, and he reiterated that Dr. Conneally had recommended that the defense retain Dr. Blake to retest the DNA samples "and also because Doctor Blake has expertise in forensic and criminology where Doctor Conneally does not." The military judge adhered to her earlier rulings and reiterated:

> [W]hen the defense makes a request to the convening authority for an expert by name and the convening authority grants it, then the convening authority can rely that the defense has done its homework and has determined that this defense expert possesses the requisite qualifications at that time.

At oral argument before this Court, appellant government counsel asserted that a retest would have delayed the trial by one and a half months. Appellate defense counsel asserted that consultation with Dr. Blake would have taken only "a couple of days," and a retest could have been accomplished within 24 hours after Dr. Blake received the samples.

When trial on the merits began on June 12, 1996, the defense did not present any expert testimony at trial. The record does not reflect whether defense counsel consulted further with Dr. Conneally after the military judge denied the request to employ Dr. Blake.

## Discussion

Appellant now contends that the military judge was arbitrary and capricious in denying the defense requests to substitute Dr. Blake for Dr. Conneally, retest the unknown material found under PFC Shanklin's fingernails, and verify that the blood samples used by the Government's laboratory was actually appellant's. The Government argues that appellant was provided with "more than ample expert assistance" and that the military judge did not abuse her discretion by denying the request for retesting, because appellant failed to identify any substantive defects in the chain of custody or point to any evidence of contamination.

When an accused asks for expert assistance, "he must demonstrate the necessity for" it. United States v. Garries, 22 MJ 288, 291 (CMA), cert. denied, 479 U.S. 985 (1986). An accused is not entitled to a specific "expert of his own choosing," but is entitled only to "competent assistance." United States v. Burnette, 29 MJ 473, 475 (CMA), cert. denied, 498 U.S. 821 (1990). We review a military judge's decisions on requests for expert assistance for abuse of discretion. United States v. Short, 50 MJ 370, 373 (1999), cert. denied, 528 U.S. 1105 (2000).

The necessity for expert assistance is not at issue in this case. The only issue is whether appellant was provided "competent assistance."

In this case, the DNA testing was done in 1995 and appellant was tried in 1996. At that time, PCR testing was relatively new. Indeed, many appellate courts were still struggling to determine if PCR testing was sufficiently reliable to be admissible. See 2 Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence §

18-5(A) at 53-54 n. 165 (3d ed. 1999); see also Federal Judicial Center, Reference Manual on Scientific Evidence [hereafter 1994 Reference Manual] 277 (1994).

With the rapid growth of forensic-science techniques, it has become increasingly apparent that complex cases require more than general practitioners. See Edward J. Imwinkelried, Expert Witness: An Unheralded Change, The National Law Journal at A10 (February 5, 2001). Well before this case was tried, courts began finding that forensic DNA testing was beyond the ken of many traditional "experts." See 1994 Reference Manual at 63; see also Federal Judicial Center, Reference Manual on Scientific Evidence 490 (2d ed. 2000) ("Courts have noted the lack of familiarity of academic experts--who have done respected work in other fields--with the scientific literature on forensic DNA typing.").

The prosecution's DNA expert in this case testified that DNA initially was used for medical research, to identify genes that cause diseases. She testified that her employer, LabCorp, divided its operation into three functional areas: medical diagnosis, paternity testing, and forensic testing. Finally, she testified that, in the short time between the DNA testing of the evidence in this case and appellant's trial, tests for two additional genetic systems were implemented at her laboratory.

Defense counsel asserted, without contradiction by the prosecution, that there were no DNA testing laboratories in Hawaii. Thus, the defense was required to find an appropriate expert in mainland United States.

Dr. Conneally's curriculum vitae demonstrates that his expertise was in the area of medical genetics, not forensic testing. He told appellant's defense counsel that appellant needed an expert in forensic PCR testing. Dr. Blake is an expert in forensic testing.

The substitution of Dr. Blake for Dr. Conneally or the addition of Dr. Blake to the defense team would not have incurred any increased cost to the Government. In this case appellate government counsel have asserted that the trial might have been delayed 6 weeks, while appellate defense counsel have insisted that it would have taken only a "couple of days" for defense counsel to consult with Dr. Blake and 24 hours to retest the sample. At trial and on appeal, government counsel did not assert that a delay of 6-8 weeks would have prejudiced their case.

The DNA evidence was the linchpin of the prosecution case. It excluded all possible suspects except appellant. Appellant was on trial for murder, facing a life sentence, and needed the tools to competently test the prosecution's DNA evidence. On its face, the Government's DNA evidence appeared incomplete, because it was not subjected to the tests for two additional genetic systems that were developed after the Government's evidence was first tested. The two additional tests were evidence of the rapid pace of development in the area of PCR testing.

While defense counsel was not as articulate as we would like in explaining why Dr. Conneally could not provide "competent assistance," it is clear from the record as a whole that the defense needed expert assistance in the technical aspects of PCR

14

testing, not the general scientific principles underlying it.  It is also clear from the military judge's exhortation -- "[D]on't make this DNA evidence into something more than it really is" -- that she did not fully appreciate the complexities or importance of the DNA evidence and the rapidly advancing technology of DNA testing.

Appellant needed more than generalized expertise in genetic medical diagnosis; he needed specific assistance in the then-new and rapidly evolving techniques of PCR testing.  Appellant needed an expert to testify how many genetic systems were capable of being compared with the technology then available.  He needed an expert to challenge or contradict Ms. Clement's assertion that additional tests probably would not exclude appellant as a suspect.  Dr. Conneally either could not or would not provide those tools.  The defense proffer was that Dr. Blake could have provided those tools at no additional cost to the Government.

The defense request for Dr. Blake was timely.  Nineteen days after the request for Dr. Conneally was approved, the defense informed the military judge that they needed an expert in PCR testing.  Almost a month before trial, the defense specifically requested Dr. Blake.  There is no evidence of bad faith or witness shopping, and no indication that the prosecution would have been prejudiced by any delay.  See generally United States v. Miller, 47 MJ 352, 358 (1997) (factors to be considered  in deciding whether to delay a trial).

The military judge did not focus on the issue whether Dr. Conneally was able or willing to provide the needed expertise. Instead, she focused on taking defense counsel to task for

requesting an expert who was either unable or unwilling to provide what the defense needed, i.e., expertise in PCR testing. See United States v. Weisbeck, 50 MJ 461, 465-66 (1999) (military judge abused discretion by denying expert assistance that went to heart of defense and would have delayed trial only 6 weeks, and military judge focused only on "holding the defense's feet to the fire").

We conclude that the military judge's focus on holding the defense's feet to the fire arbitrarily deprived appellant of the tools he needed. Accordingly, we hold that the military judge abused her discretion.

Although appellant did not receive the competent expert assistance that was necessary, we are unable to determine whether the court-martial's findings of guilty were "substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946). In our view, the interests of justice will be best served by returning this case to the Judge Advocate General and giving appellant an opportunity to demonstrate to the Court of Criminal Appeals, with the assistance of an expert in PCR testing, how he would have changed the evidentiary posture of this case if the military judge had granted his request for Dr. Blake. See United States v. Curtis, 31 MJ 395 (CMA 1990).

Legal and Factual Sufficiency (Specified Issues I and II)

Appellant asserts that the court below made numerous findings of fact that are unsupported by the record. Among the asserted factual errors are the following:

16

(1) The court below found that "Ms. McCloud saw a white car driving away" (unpub. op. at 4); she testified only that she saw a white car in the parking lot.

(2) The court below found that Kijafa Walker "ran outside and requested help" from SGT Robinson (unpub. op. at 4). Appellant asserts that Kijafa made "small talk" with SGT Robinson and then told him that she could not awaken PFC Shanklin. The record of trial reflects that Kijafa "started in with small talk" and then told SGT Robinson that she could not awaken PFC Shanklin; and that she then asked to speak with Mrs. Robinson.

(3) The court below found that appellant responded to SGT Robinson's request to "come over to the quarters" by spontaneously asking, "Why is Carla dead?" (Unpub. op. at 4) (comma omitted after "Why" in unpublished opinion); the record reflects that Kijafa initially told the CID that she told appellant that PFC Shanklin "might be dead," but that she recanted that statement at trial.

(4) The court below stated: "Appellant's alternative explanation for the scratches [on his hands and arms] was that they occurred while he was working on his car." Unpub. op. at 6. Appellant asserts that no member of the defense team ever claimed that he was scratched while working on his car.

## Discussion

The Courts of Criminal Appeals are unique in that they are charged with "the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency." United States v. Turner, 25 MJ 324 (CMA 1987). They must be "convinced of" an appellant's "guilt beyond a reasonable doubt."

17

Id. at 325.  If our Court is in doubt whether the court below properly determined the factual sufficiency of the evidence, the remedy is to remand the case for a proper factual review of the findings of guilty.  Id.  Our Court "will not overturn findings of fact by a Court of Criminal Appeals unless they are clearly erroneous or unsupported by the record."  United States v. Tollinchi, 54 MJ 80, 82 (2000), citing United States v. Avery, 40 MJ 325, 328 (CMA 1994).

In this case, we need not decide whether the factual-sufficiency determination by the court below was defective, in light of our decision regarding the Granted Issue and Specified Issue III.

## Decision

The decision of the United States Army Court of Criminal Appeals is set aside.  The record of trial is returned to the Judge Advocate General for remand to the Court of Criminal Appeals.  The Judge Advocate General will provide $5000 to appellant for employment of Dr. Blake or another equivalent expert.  Thereafter, appellant will have 90 days to file supplemental pleadings with the court below, which may order a factfinding hearing if the additional pleadings make it necessary.  The court below will reconsider the factual and legal sufficiency of the evidence in light of any additional matters submitted by appellant, taking specific cognizance of the factual errors asserted by appellant as the basis for Specified Issue I. In the alternative, the court below may order a rehearing.

United States v. McAllister, No. 00-0252/AR

CRAWFORD, Chief Judge (dissenting):

Contrary to the majority's view that "[t]he necessity for expert assistance is not at issue in this case," ___ MJ at (13), I believe the sole issue is whether appellant demonstrated that Dr. Blake's expert assistance was necessary. A concession that an appellant is entitled to interpretive assistance from one expert does not, ipso facto, turn a necessity-for-a-second expert question into an adequacy-of-expert-assistance inquiry. That appears to be what the majority has done. Accordingly, I respectfully dissent.

Upon a showing of necessity, any accused is entitled to competent assistance of an expert. See Ake v. Oklahoma, 470 U.S. 68 (1985); United States v. Gunkle, 55 MJ 26, 31 (2001); United States v. Short, 50 MJ 370, 372 (1999), cert. denied, 528 U.S. 1105 (2000); United States v. Ndanyi, 45 MJ 315, 319 (1996); United States v. Burnette, 29 MJ 473, 475 (CMA), cert. denied, 498 U.S. 821 (1990); United States v. Garries, 22 MJ 288 (CMA), cert. denied, 479 U.S. 985 (1986). This Court has adopted a three-pronged test for showing that expert assistance is necessary. United States v. Gonzalez, 39 MJ 459, 461, cert. denied, 513 U.S. 965 (1994). See United States v. Ford, 51 MJ 445, 455 (1999). It is the defense's burden to show (1) why the expert is needed; (2) what such expert assistance would accomplish for the defendant; and (3) why defense counsel is

"unable to gather and present the evidence that the expert assistant would be able to develop."  Once defense counsel has met this Gonzalez test and shown necessity, the Government must provide "competent" expert assistance.  See Ndanyi, 45 MJ at 319.  Additionally, "[d]efense counsel are expected to educate themselves to obtain competence in defending an issue presented in a particular case."  United States v. Kelly, 39 MJ 235, 238 (CMA), cert. denied, 513 U.S. 931 (1994).

By specifically approving the defense request to hire Dr. Conneally, the Government conceded that appellant was entitled to expert assistance in interpreting the DNA findings of LabCorp, and nothing more.  See RCM 703(d), Manual for Courts-Martial, United States (1995 ed.).  The Rules for Court-Martial are not written to provide trial defense counsel with "a credit card" once necessity for one expert witness is established.  If Dr. Conneally was unable to provide the advice for which money was appropriated, then it was incumbent on defense counsel to demonstrate, anew, necessity, using the Gonzalez test, for Dr. Blake.  To say that because money had been set aside for one expert (Dr. Conneally) for a particular purpose, that money belonged to defense counsel and could automatically go to a different expert (Dr. Blake) for different assistance is contrary to RCM 703(d).

The sole hypothesis under which trial defense counsel argued the necessity of Dr. Blake's expert assistance was that the victim's fingernails (and skin under the fingernails from which DNA analysis was made) were somehow "contaminated." Dr. Blake was not shown to be a relevant and necessary expert witness on the subject of contamination. Accordingly, the military judge properly denied the defense's request to substitute Dr. Blake for the previously funded Dr. Conneally.

FACTS

Detailed defense counsel requested the general court-martial convening authority to approve employment of Dr. Patrick M. Conneally, Ph.D., an expert consultant in the field of DNA analysis, on March 20, 1996. In support of his request, detailed defense counsel stated:

> Defense believes that it is necessary that an expert consultant review the Government's DNA analysis, review the Government's findings and procedures, independently analyze the data, and familiarize defense counsel with DNA uses generally.

Later in the same request defense counsel wrote: "Should Government grant Defense's request for Dr. Conneally's services, there is the probability that Dr. Conneally will testify as a Defense expert witness in the case of U.S. v. McAllister." Defense counsel had been in possession of LabCorp's (see ___ MJ at (6), infra) findings and report for 2 months prior to this request to employ Dr. Conneally. Presuming defense counsel to

3

be both competent and ethical, we must presume that defense counsel and Dr. Conneally talked about LabCorp's report and PCR testing procedures prior to defense counsel's March 20 request to employ Dr. Conneally as an expert. On April 4, 1996, the convening authority approved Dr. Conneally's employment, as well as that of another expert, Dr. Hardman, a forensic pathologist.

Pursuant to a government motion to admit DNA evidence, the military judge held a hearing on April 23, 1996. Prior to taking testimony, the military judge asked defense counsel whether they were "satisfied" with their DNA expert (Dr. Conneally). Civilian defense counsel responded:

> He was approved at least for -- to act as a consultant. There was not approval for him for funding for trial testimony. We did send him the materials. We did have a consultation. He recommended, frankly, that we retain someone who is an expert in PCR testing, specifically.

After determining that defense counsel was shopping for an expert and "attempting to contact Dr. Conneally to get his suggestions on someone, hopefully out of California," the military judge cautioned counsel that they needed to submit the request for any additional expert witnesses first to the convening authority and that it was "not up to the Government to find" their expert witnesses for them.

Trial counsel later on presented witnesses who were present at PFC Shanklin's autopsy. In particular, evidence was adduced that explained how Dr. Ingwersen cut the deceased's fingernails

and how these fingernails were collected and preserved. Defense counsel's cross-examination clearly focused on the possibility of contamination during the autopsy process.[1] In particular, counsel explored whether the deceased's hands had been covered prior to the autopsy. Questioning revealed that PFC Shanklin's hands and feet had been wrapped in paper bags prior to the autopsy. Defense counsel also asked whether any of the participants in the autopsy coughed or sneezed during the procedure.

Mr. Overson, from the CID lab in Atlanta, explained his receipt of the items to be tested from the CID office in Hawaii and the transfer of these items to LabCorp for testing. Again, the theme of potential contamination played a prominent part in the examination and cross-examination of Mr. Overson. Counsel established that Mr. Overson saw dirt or a substance that appeared to be dirt under the deceased's fingernails, and that the deceased used fingernail polish. Cross-examination also established that Mr. Overson "did not see any apparent blood, apparent skin," or "any apparent other substance extraneous to the fingernail scrappings which I would call a definite biological substance."

---

[1] As an example, defense counsel asked whether those assisting the pathologist and collecting evidence were wearing gloves, medical clothing, masks, or hairnets; how many other people were in the room; whether the envelope into which the fingernails were dropped after clipping was sealed; and whether the CID agents who collected evidence at the autopsy wore medical accoutrement on their return trip to the office.

Following Mr. Overson, Ms. Meghan Clement, Assistant Director of Forensic Identity Testing at Laboratory Corporation of America Holdings Incorporated, was qualified as an expert witness.  Ms. Clement testified that the "scientific community has been conducting DNA testing probably since the late 70s, early 80s."  She noted that "the scientific community has reached the conclusion that as long as a test is performed properly and proper controls are employed that DNA testing in a forensic arena is reliable and acceptable."  Ms. Clement explained that the forensic scientific community recognized three types of DNA testing, one of which, polymerase chain reaction (PCR), was used in appellant's case.[2]  She observed that there were "numerous major laboratories, including the Federal Bureau of Investigation," that were "doing some type of PCR analysis or initiating it in validation studies."  She remarked that LabCorp was certified by the College of American Pathologists (CAP) and that the laboratory participated in proficiency testing programs sponsored by CAP as well as Selmark Diagnostics from London, England.

---

[2] The technique called polymerase chain reaction was invented by Kary Mullis in 1985.  It enables an examiner to "find and amplify specific segments of DNA from complex mixtures."  Griffiths et al, Modern Genetic Analysis 21 (W.H. Freeman and Co., New York (1999)).  "PRC is very sensitive and can detect target sequences that are in extremely low copy number in a sample."  Additionally, this technique requires no lengthy cloning procedures and "no restriction digestion of the substrate DNA is needed.., because the primers will hone in on the appropriate sequence of native DNA."  Id. at 326.

At trial, Ms. Clement testified that LabCorp tests ten areas (or particular genetic systems) for DNA.  In the case at bar, LabCorp examined eight particular DNA target areas -- DQ Alpha, LDLR, GYPA, HBGG, D7S8, GC, D1S80, HUMTHO1.  When these specimens were initially submitted for examination, LabCorp was testing only eight different areas for DNA.  The two other areas, which LabCorp had added by the time of trial, were not validated when the samples related to appellant's case were undergoing analysis.

The best answer to the majority's supposition that additional testing may create a different result can be found in the record of trial.  During recross-examination of Ms. Clement, defense counsel asked "how can it be said with any assurance that matches would not be found if the tests were carried out to their fullest extent?"  Ms. Clement answered:

> With DNA analysis if there is a difference at a single genetic system, in other words, if there is a characteristic which is not found in evidentiary materials, then that person is excluded immediately.  Whether you test 1 system or whether you test 10 systems they will be excluded the minute you find one characteristic which is different.

The remainder of defense counsel's cross-examination focused on showing that the DNA may have been contaminated through sneezing or improper handling of the fingernails.  Ms. Clement explained that "[w]ithin our laboratory there have been a couple instances of contamination which has been detected.  Generally, the most

7

common form of contamination is by the analyst [sic] themselves. And we have complete profiles on every technologist who works there." If additional DNA testing, as the majority wishes, found contamination by a technologist at LabCorp, it would provide no benefit to appellant unless appellant can somehow make a laboratory analyst in the Research Triangle of North Carolina a suspect in a murder that took place in Hawaii.

At the time she announced her findings on the Government's motion to admit LabCorp's DNA testing results, the military judge informed counsel that any defense request for further DNA testing would need to be submitted to the United States not later than close of business on April 29.[3] On April 29, government counsel received a FAX from the accused's civilian defense counsel requesting the retesting of "alleged DNA fingernail material" by Forensic Science Associates in Richmond, California.

At an Article 39(a) session on May 15, 1996, civilian defense counsel asked the military judge to allow substitution of Dr. Edward Blake for Dr. Conneally as the defense DNA expert. Counsel informed the military judge that Dr. Blake ran Forensic

---

[3] Defense counsel informed the judge that Dr. Conneally had not appeared at the April 23 Article 39(a), UCMJ, 10 USC § 839(a), session due to his unavailability. Although there was some uncertainty whether Dr. Conneally would testify because his rates exceeded the amount allowed under the Joint Travel Regulation, the military judge announced that "money's not going to be the determining factor on whether he comes. If he has got pertinent information, I can order that a subpoena be issued and he testify as a $35.00 a day witness if he's got matters relevant to a case that the United States is a party. Marshals can make sure he comes." R. 366.

Science Associates, a DNA testing laboratory in California, and that he would retest the fingernail evidence.  Defense counsel stated that Dr. Blake had labeled LabCorp as a "paternity testing lab" without "specific experience in criminal forensic testing."  In response to the military judge's question to civilian defense counsel as to whether Dr. Blake's California lab was certified, the following took place:

      CDC:  I believe so----

      MJ:   Because it's not listed in the----

      CDC:  ---I would have to----

      MJ:    It is not listed in the offer nor is it listed in the qualifications for Doctor Barker [sic] nor-- Mr. Barker [sic] nor or [sic] any qualification listed down for him.

      CDC:  He is the person who invented one of the DNA tests----

      TC:  I don't believe he invented DQ Alpha, ma'am.  The person who invented DQ Alpha got the Nobel Prize.

      MJ:  Yeah, that's my recollection too, although it's certainly not in evidence.  Because in the, I guess what passes to be a curriculum vitae for Doctor Barker [sic], he lists only two areas that that lab tests in whereas LabCorp tested, according to the exhibits submitted along with the government's response, that the testing was actually done like in eight different areas.  **So, how on earth can this lab retest what it doesn't have the capacity to retest?**  And there's no showing of any kind of controls that the requested lab employees, there's no showing of any testing, I guess that's done by peer review organizations on any sort of regular basis.  In other words, I guess what I'm asking for is even if this retesting were done, how would this-- how would you set a foundation for this under United States versus Youngberg or Merrell Dow case?  Because that was the whole point of Megham Clement coming and testifying was to lay the foundation which is required to be laid for

9

> scientific testimony.  That's not in the offer here, because I think what I'm reading is the basis of your motion is you think the convening authority applied an incorrect standard in reviewing the request for independent testing.  So, I guess my question is what do you think the standard is for testing DNA evidence?  Because what I read is that there are some broad statements that you have to, you know, clip the nails in half and I don't recall Meghan Clement ever testifying about whether nails were clipped or not clipped.  What I recall her saying is that the materials are still available for retesting.  Does the government-- do you know?

(Emphasis added.)  At that point defense counsel adopted the "possibility of contamination" theory as a reason for needing Dr. Blake's expertise.  After applying the law announced by this Court in United States v. Gonzalez, United States v. Kelly, and United States v. Garries, all supra; and United States v. Mosley, 42 MJ 300 (1995), the military judge found that defense counsel had not met his burden of showing what Dr. Blake's laboratory would contribute to the defense case other than providing a mere possibility of something being discovered.

Having failed to show the necessity for Dr. Blake's expert assistance, counsel then argued his alternative theory to contamination: a failure in the chain of custody that caused defendant's blood sample to be mislabeled as a reason for needing Dr. Blake's assistance.  Finally, defense counsel argued "fundamental fairness."  In reply the military judge stated:

> MJ:  I see your point but there still has to be some kind of showing of likelihood of error for it to arise to an issue of fundamental fairness.  Remember Mosley was a $250.00 EME test that had never been performed.

                              * * *

     MJ:  So, that is a different situation.  That would be
like you coming in and saying, "Doctor Blake only performed
DNA for the government on two DNA areas, yet there is a lab
called LabCorp that could test in eight different areas
which would reduce the likelihood of an incorrect result."
Then I might look at it differently if there are tests that
would be available that could do more.  But that's not what
you're asking for here.  And this is not a Mosley type
issue when you're talking about $250.00 EME test.  This
does not arise to an issue of fundamental fairness in this
case.

Lastly, civilian defense counsel said:  "The defense position really is that we would like to substitute Dr. Blake for Dr. Conneally----"  The military judge correctly noted that this substitution-of-experts issue was not before the court because the "convening authority, in good faith, relied upon the defense representation, looked at Dr. Conneally's qualifications ... [and] gave the defense what they wanted."  This Court has never held that once a convening authority funds a necessary defense expert that those funds then come under the dominion and control of either defense counsel or the funded expert witness for use to hire different experts as they see fit.

                           DISCUSSION

RCM 703(d) clearly states that it is the convening authority who "authorize[s] the employment" and "fix[es] the compensation for the expert," not the defense counsel.  The only remedy for refusal to provide judicially determined expert help is abatement of the proceedings.

                               11

Accordingly, one must then look at the military judge's findings to see whether she abused her discretion by refusing to order substitution of Dr. Blake and his Richmond, California, laboratory for Dr. Conneally.

When one sorts through the fog surrounding defense counsel's three written requests for substitution of DNA expert assistance, argument of counsel, and responses to questions in the record of trial, it is obvious that defense counsel wanted a retest of the victim's fingernails based on his theories that the chain of custody which got appellant's blood sample to LabCorp in North Carolina was faulty and that there was a possibility of contamination. Defense counsel failed to specifically allege or show that Dr. Conneally was incompetent to render the assistance for which he was hired.

There is absolutely no allegation that LabCorp's findings were somehow improper unless they had received contaminated fingernails or tainted blood. Counsel was unable to identify any irregularity in the testing of the deceased's fingernails or even make an offer of proof that would warrant hiring Dr. Blake and his laboratory. For example, counsel never argued how additional testing might point to another theory of the crime or cause of death. Cf. Barnabei v. Angelone, 214 F.3d 463, 474 (4th Cir.) cert. denied, 530 U.S. 1300 (2000). Accordingly, defense

12

counsel did not demonstrate necessity for this second DNA expert.

The chain-of-custody issue and the potential mix-up of vials of blood, to include appellant's, was thoroughly litigated at trial.  Defense counsel's piercing cross-examination failed to undermine the reliability of the handling and custody of either the victim's or appellant's vials of blood drawn in Hawaii.

The issue of potential contamination was more than thoroughly explored by defense counsel during his cross-examination of those witnesses who conducted the autopsy, as well as his cross-examination of Ms. Clement.  The defense theory was that the deceased's fingernails had become contaminated in some manner by those conducting the autopsy (such as sneezing on them) and as a result of that contamination, the DNA test was unreliable.  Testimony revealed, however, that the victim's hands were wrapped before the autopsy and palms were facing down after being exposed.  Therefore, there was much less opportunity for any contaminates (and none were ever shown to exist) to get under the nails.  Further questioning showed the victim's fingernails were short anyway.

Expert witnesses are not necessary for a knowledgeable defense counsel to adequately test a chain of custody or the possibility of sample contamination.  Appellant's civilian

13

defense counsel was well prepared and did a good job of contesting both areas.  The court members obviously decided that neither was an impediment to finding Specialist McAllister guilty.  As defense counsel failed to demonstrate why Dr. Blake was "necessary" under this Court's Gonzalez test, the military judge did not err.  The mere possibility of assistance from an expert does not rise to the level of necessity.  See Mosley, 42 MJ at 307 (Crawford, J., dissenting); Moore v. Kemp, 809 F.2d 702, 712 (11th Cir.), cert. denied, 481 U.S. 1054 (1987).

LEGAL AND FACTUAL SUFFICIENCY

Defense counsel had two theories of the case:  (1) PFC Shanklin died of natural causes (a seizure); and (2) somebody murdered her but it wasn't appellant.

Counsel's theory that PFC Shanklin died of natural causes was premised on the fact that the victim had passed out on one or two occasions in the Hawaiian heat while standing at attention during formations.  The findings of the autopsy -- that the victim died as a result of suffocation due to strangulation -- certainly did not advance this position.

Appellant's second theory, that someone other than him killed PFC Shanklin, can also be put to rest by the evidence. Contrary to the defense's assertion, the DNA evidence is not the only evidence that places appellant at the murder scene or shows

14

that he had the opportunity to kill the victim.  Appellant convicted himself without ever taking the stand.

Appellant's statements to his fellow soldiers; past physical altercations with the victim, which included periods of choking; his futile attempts to get Staff Sergeant Rogers to manufacture an alibi for him; his mysterious visit to Sergeant Grady with a box and a request for Grady to get rid of that box on the morning after the murder; as well as appellant's highly incriminating remark ("Why, is she dead?") when first told that "something happened to" PFC Shanklin are legally sufficient for a rational factfinder to convict appellant of PFC's Shanklin's murder.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Turner, 25 MJ 324 (CMA 1987).  While I share the majority's concern with some of the minor factual discrepancies in the Court of Criminal Appeals decision, I do not find the factual-sufficiency determination by the court below to be defective.

<u>United States v. McAllister</u>, 00—0252/AR

SULLIVAN, Judge (dissenting):

The majority sets aside the Court of Criminal Appeals'
decision in appellant's case which affirmed his conviction for
murder and a life sentence.  It does so on the basis that the
judge abused her discretion in denying appellant's request for
expert assistance from Doctor Blake and denying his request for a
continuance and a retest of a DNA sample.  The majority (___ MJ
at (16)) concludes that the judge acted "arbitrarily" in denying
these motions because she "focus[ed] on holding the defense's
feet to the fire" for "requesting an expert who was either unable
or unwilling to provide" tools to challenge the Government's DNA
evidence.  <u>See</u> <u>generally</u> <u>United States v. Weisbeck</u>, 50 MJ 461,
466 (1999).  I dissent.

The premise of the majority opinion is flawed and,
accordingly, I cannot join its conclusion.  In my view, the
military judge was "focused" on the defense's burden to show its
requests for government assistance were necessary for a fair
trial as required by our case law.  <u>See</u> <u>United States v. Kelly</u>,
39 MJ 235 (CMA), <u>cert. denied</u>, 513 U.S. 931 (1994).  The military
judge stated in this regard:

> [W]hen the defense makes a request to the
> convening authority for an expert by name
> and the convening authority grants it,
> then the convening authority can rely that
> the defense has done its homework and has
> determined that this defense expert
> possesses the requisite qualifications at

> that time.  It was stated that Doctor
> Conneally could provide assistance to the
> defense in this case and now you're
> telling me he's not even a forensic
> scientist.  Well I guess he teaches DNA
> analysis, <u>it still appears to me that one
> who teaches DNA analysis could review the
> evidence in this case and give a helpful
> opinion, but there's still nothing in here
> showing why Doctor Blake is necessary in
> this case</u>.

R. 483  (emphasis added).

Previously, the judge denied a defense request for retesting appellant's blood sample, relying on cases from our Court which require a necessity approach to these requests as well.  She ruled:

> There's nothing that has been raised by
> the defense in this motion to show
> anything [more] than the mere possibility
> of something being discovered should there
> be retesting.  In other words, what I'm
> saying in a roundabout fashion, is that
> the standards that I must employ in--let
> me see, I've got--I guess I should put the
> cases on the record, in <u>United States v.
> Gonzales</u>, at 39 MJ 459; <u>United States v.
> Kelly</u>, at 39 MJ 235; <u>United States v.
> Garries</u>, 23 MJ 288; <u>United States v.
> Mosley</u>, at 42 MJ 300, which applies the
> Supreme Court standards in expert
> assistance provided by the Government for
> the defense case.  But those standards
> have not been met in this motion and the
> convening authority applied the right
> standards when he was reviewing under RCM
> 703.

She later said on this same request:

> I'll make a finding here that Special
> Agent Forringer testified that he took
> custody of Specialist McAllister's vial of
> blood after watching it been [sic] draw

[sic] and watching the vial.  Special Agent Benavidez testified that he took custody of the Jones' vial; he saw it being labeled; and he [had] custody and control over that vial.  The two vials were transported by different agents in different vehicles, stored in different locations.  The chain of custody has already been litigated at the prior Article 39(a) session.  Maybe all of the labeling was not 100% perfect but that's not what a chain of custody requires. <u>There is no showing of a likelihood or a true possibility of mix-up of those samples</u>.  On the vial of Specialist McAllister, the chain of custody had the name McLasiter, that is where Mr. Overson called to verify the name of the individual to verify that the correct sample was about to be tested.  And I find that he did verify the identity of the individual who had actually donated that particular sample.  So, there is nothing to suggest to me that there is any real possibility of a mix-up of samples within the chain of custody procedures.  So, that does not support a retest and neither does--at government expense, neither does the possibility of contamination in a lab just because of the difficulty in avoiding contamination in that setting when there is no real showing of a true possibility of contamination in that particular lab doing these particular tests.  That does not say that the defense cannot, at its own expense, have a retest, provided it can be accomplished by the day of trial in this case.  Or cannot cross-examine the witness on the inherent validity of DNA analysis because of the complexities of maintaining a contamination free environment.  Those will be matters for the members to determine or to weigh in weighing the value of that evidence in their own minds.  But I am denying the defense motion to compel the Government to pay for a retest and to grant a continuance until such time as that should be done.  <u>There's just not a sufficient</u>

3

> showing in this case to compel the
> Government to do it.

R. 446-47  (emphasis added).


The Court of Criminal Appeals also affirmed appellant's

conviction.  It said:


> As to the second DNA expert request, we
> apply the same standard, that is,
> appellant must meet his burden of
> demonstrating the necessity for Dr.
> Blake's services.  In approving the
> defense request for Dr. Conneally, the
> convening authority gave the defense more
> than they were entitled to receive, i.e.,
> a specifically named expert consultant.
> Dr. Conneally's curriculum vitae
> established him as an eminently qualified
> expert with over thirty years experience
> in medical genetics culminating in his
> current position as the Distinguished
> Professor of Medical Genetics and
> Neurology, Indiana University School of
> Medicine.  His appointment to the defense
> team gave the appellant more than "the
> 'basic tools' necessary to present his
> defense."  Kelly, 39 MJ at 237 (citing
> Ake, 470 U.S. at 77).  Appellant failed to
> advance any plausible reason why Dr.
> Conneally could not provide the necessary
> expert assistance.  The request for Dr.
> Blake to be substituted for Dr. Conneally
> was not based on any inability on Dr.
> Conneally's part to provide the necessary
> assistance.  It was instead a thinly
> veiled attempt to get the re-test that had
> been denied by the military judge.
> Indeed, as noted by the convening
> authority in his denial of the requested
> substitution, the request for Dr. Blake
> was identical in nineteen of twenty-one
> paragraphs to the request for the re-test
> that had been denied.  As the defense
> failed to demonstrate any reasonable
> necessity, the military judge did not
> abuse her discretion in denying the

defense request to substitute Dr. Blake
for Dr. Conneally.

   As to the defense request for a re-test
of the DNA specimen, we again apply the
Garries reasonable necessity standard,
that is the defense "must demonstrate
something more than a mere possibility of
assistance" from a re-test.  See Robinson,
39 MJ at 89.  The defense request was
based on (1) a possible mix-up of
appellant's blood specimen with that of
SSG Jones, and (2) possible contamination
of the fingernail specimen either at the
crime scene or at the laboratory.  We find
the possibility of a mix-up of the blood
specimens to be so infinitesimal as to be
non-existent.  The only "defect" that
appellant could point to was the slight
misspelling of his name on the DA Form
4317.  That "defect" was adequately
explained by SA Forringer and is so de
minimis as to have absolutely no effect on
the chain of custody.  As to the possible
contamination, the defense failed to
produce even a scintilla of evidence of
any contamination.  The defense merely
asked speculative questions of[,] if
someone sneezed or coughed on the
decedent's fingernails[,] could that have
contaminated the specimen.  That is a far
cry from producing any evidence that any
person did cough or sneeze on the
decedent's fingernails.  The defense's
conclusional assertion, that there may
have been contamination because DNA
testing is by its nature sensitive, was
unsupported by any evidence.  In addition
to failing to identify any defect in the
chain of custody or any contamination of
the sample, the defense failed to identify
any laboratory error, any misconduct or
negligence by any laboratory personnel, or
any misinterpretation of the test results.
Unlike the drug test in United States v.
Mosely, 42 MJ 300 (1995), the DNA retest
in the instant case would not have been
minimal in terms of time and resources.
We find that the military judge did not
abuse her discretion in denying the

> defense request for a re-test of the DNA
> specimen.

Unpub. op. at 10-11 (first emphasis added; footnote omitted).


In sum, the majority's narrow view of the basis for the military judge's rulings in this case dictates the result it reaches on this appeal. See United States v. Weisbeck, 50 MJ at 466. While I agree with the Weisbeck decision, I do not agree it is applicable in this case. Moreover, the evidence in this case is more than sufficient under the test of Jackson v. Virginia, 443 U.S. 307, 319 (1979). Accordingly, I dissent to the majority effectively reversing a jury conviction of murder on the slender reed which mistakes this case for the real injustice suffered in Weisbeck. There was no injustice in this trial and the conviction should be affirmed.